**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang**

Civil Action No. 23-cv-02768-NYW-CYC

KAITLYN ROONEY,
RUPJOT NAGRA, and
TEONA MIRCESKA,

      Plaintiffs,

v.

CITY OF AURORA,[1]

      Defendant.

---

**MEMORANDUM OPINION AND ORDER**

---

This matter is before the Court on Defendant's Motion for Summary Judgment ("Motion"). [Doc. 38].[2] Plaintiffs responded in opposition, and Defendant replied. [Doc. 42; Doc. 45]. The Court has reviewed the Motion, the related briefing, the applicable case law, and the entire docket. For the reasons set forth herein, Defendant's Motion for Summary Judgment is respectfully **GRANTED in part** and **DENIED as moot in part**.

---

[1] For the reasons set forth below, the Court **ORDERS** that the City of Aurora be **SUBSTITUTED** as Defendant to this action.

[2] Where the Court refers to the filings made in the Electronic Case Files ("ECF") system in this action, it uses the convention [Doc. __] and refers to the page number assigned by the ECF system, except when citing from the transcript of a deposition. When citing the transcript of a deposition, the Court uses the ECF docket number but cites to the page and line numbers as assigned in the original transcript.

**BACKGROUND**

The facts in this section are drawn from the summary judgment record and are undisputed unless otherwise noted.

This case involves alleged employment discrimination and retaliation. Plaintiffs Kaitlyn Rooney ("Ms. Rooney"), Rupjot Nagra ("Ms. Nagra"), and Teona Mirceska ("Ms. Mirceska") (collectively, "Plaintiffs"), all young women, were participants in Defendant Aurora Police Department's ("Defendant") Explorer Program (or "the Program"), an educational and volunteer program for law enforcement-interested youth between the ages of 14 and 21.[3] [Doc. 38 at 1; Doc. 42-3 at 3–7].

***The Explorer Program.*** The Explorer Program is organized and formally supervised by sworn Aurora Police Department officers known as "Advisors." [Doc. 38-4; Doc. 42-2 at 3]. Although applicants must complete an application and pass a criminal background check, the Program accepts all applicants who meet these minimum requirements. [Doc. 38-2 at 14:9–25].

Once accepted, participants, known initially as "Explorer Recruits," are required to complete a sixteen-week Saturday training academy. [Doc. 42-3 at 3, 6]. After the training academy, recruits are given the rank of "Explorer," and the Aurora Police Department provides them with a uniform, including Explorer patches, and later, metal badges, police-station keycards, and organizational email accounts. [Doc. 38-2 at 23:4–24:4; Doc. 42-3 at 7–8]. Explorers must attend biweekly meetings, where they receive additional law enforcement training, and volunteer at a handful of annual community

---

[3] The official name of the Program is "Aurora Police Department Explorer Post #2024." *See* [Doc. 42-3 at 4].

events sponsored by the Aurora Police Department, primarily assisting with traffic and crowd control.  [Doc. 38-2 at 21:22–22:11, 25:7–12; Doc. 38-3 at 29:1–20; Doc. 42-3 at 8–9].

Beyond these basic requirements, participation in other activities is voluntary. [Doc. 38-2 at 25:7–16; Doc. 42-3 at 3].  Explorers may take part in additional community-service events, assist the police at DUI checkpoints, participate in "ride-alongs," and, if selected, attend leadership conferences or compete against other Explorer Posts at out-of-town events.  [Doc. 38-2 at 15:24–21:21; Doc. 38-3 at 29:21–31:24; Doc. 42-3 at 3, 26, 28].

The Explorer Program is organized with a paramilitary structure mirroring the Aurora Police Department.  [Doc. 38-4; Doc. 42-3 at 20].  Explorers may advance to ranks such as Specialist, Agent, Sergeant, and Lieutenant.[4]  [Doc. 42-3 at 19].  Higher-ranking Explorers have some supervisory authority over junior members, who are expected to follow the chain-of-command.  [*Id.* at 2, 13; Doc. 38-3 at 3]. Explorers receive an annual performance review from their Program supervisor.  [Doc. 42-3 at 9].

Explorers are also subject to the Program's Standing Operating Procedures ("SOPs"), which govern matters such as dress, punctuality, personal conduct, and social-media use.  *See* [*id.*].  Violating the SOPs or other misconduct may result in discipline imposed by Advisors or higher-ranking Explorers, ranging from verbal reprimands to dismissal from the Program.  [*Id.* at 13–16, 20; Doc. 42-7 at 29:11–23].

---

[4] For ease of reference, this Order refers to participants in the Program generally as "Explorers" regardless of their rank.

Explorers may choose to leave the Program at any time and do not receive financial compensation. [Doc. 38-2 at 13:5–13; Doc. 42-1 at 51:16–18]. They are not eligible for workers' compensation or primary health insurance.[5] [Doc. 42-3 at 21]. They are, however, permitted to access the same mental health counseling services available to sworn police officers. [Doc. 38-6 at 12:4–13; Doc. 42-7 at 46:12–25]. Participants who complete at least two years, perform a minimum of 100 service hours, and leave the Program in good standing are eligible for a maximum of ten civil service "preference points" if they later apply to the Aurora Police Department. [Doc. 38-2 at 13:14–14:2; Doc. 42-3 at 23].

***Plaintiffs' Experiences in the Program.*** Ms. Rooney joined the Program in 2016; Ms. Nagra in 2017; and Ms. Mirceska in 2018—at ages 14, 16, and 18, respectively. [Doc. 38 at ¶¶ 11–13; Doc. 42 at ¶¶ 11–13]. All three Plaintiffs dedicated many hours to the Program, going well beyond the minimum requirements, and received numerous promotions and commendations. [Doc. 42-10; Doc. 42-11; Doc. 42-12; Doc. 42-13]. However, beginning in late 2018, Plaintiffs experienced a number of incidents that they contend reflect a pattern of sex-based discrimination. The Court will briefly overview these events.

In October 2018, Rooney sent out a "memo of concern" to the Explorer Command Staff and Advisors. [Doc. 38-8]. Among other issues, the memo addressed perceived inequities in how male and female Explorers were expected and permitted to engage with sworn police officers. [*Id.*].

---

[5] The Program does maintain a supplemental insurance policy through the Boy Scouts of America that covers certain medical costs incurred by Explorers during Program activities. [Doc. 38-6 at 9:9–10:24; Doc. 42-3 at 21].

In November 2018, during a training exercise for an upcoming out-of-state competition, a male Explorer, S.A., touched the breasts of two female Explorers, including Ms. Nagra, while performing contraband searches. [Doc. 38-2 at 69:9–21; Doc. 42-19 at 43:19–44:12]. Ms. Nagra immediately reported the incident. [Doc. 42-19 at 45:1–20]. The head Advisor, Detective Singleton, later spoke separately with Ms. Nagra, the other female Explorer, and S.A. [Doc. 38-9]. At least at the time, Ms. Nagra expressed to Singleton that she did not wish to see S.A. dismissed from the Program or demoted. [Doc. 38 at ¶ 26; Doc. 42 at ¶ 26; Doc. 38-9 at 2]. S.A. was removed from the competition team, and he wrote a letter of apology to Ms. Nagra. [Doc. 38-7 at 51:12–20]. He was also prohibited from conducting search exercises with female Explorers, a measure Ms. Nagra requested, although it appears that this restriction was not consistently enforced. [Doc. 38-2 at 97:4–12; Doc. 38-9; Doc. 38-22 at 5].

In January 2019, during an out-of-town competition, Ms. Nagra wore leggings to a team exercise where Explorers could dress casually; a female Advisor directed her to change. [Doc. 38-7 at 70:23–71:18]. The Parties dispute whether the leggings were appropriate attire and whether Ms. Nagra was singled out for correction, but after the Advisor learned that Ms. Nagra and Ms. Rooney had discussed the incident with other officers on the trip, she made them perform physical exercises in the hotel parking lot. [*Id.* at 73:18–74:21].

In January and February 2019, Ms. Rooney received two written reprimands, known as Performance Appraisal Entries ("PAEs"). First, Ms. Rooney received a PAE for arriving at a public Explorer event in ripped jeans. [Doc. 38-11]. Ms. Rooney contends that male Explorers were not disciplined for similar dress code violations. [Doc. 42-9 at

5

11].  Second, Ms. Rooney was issued a PAE for insubordination from a male Explorer, A.B., her direct supervisor at the time.  [Doc. 38-14].  A.B. had previously expressed romantic interest in Ms. Rooney, including sending at least one flirtatious text message. [Doc. 42-1 at 65:4–17, 74:6–75:11; Doc. 42-6].  Ms. Rooney asserts that A.B. retaliated against her for rejecting his advances, first, by directing her to turn in her uniform while she would be on a trip, and later, by issuing her the PAE when she sent a text message challenging his order.  [Doc. 42-1 at 124:17–128:2].

After the second PAE, Ms. Rooney and her mother met with Detective Singleton and Sergeant Smick, another male Advisor, to discuss some of the recent issues in the Program, including the dress code and its enforcement.  [Doc. 38 at ¶¶ 47–52].  During that meeting, Sergeant Smick, in explaining how a dress code violation could become a more serious issue, suggested a hypothetical where Ms. Rooney decided that she was a "Victoria's Secret[] fashion model and wore something like that," a comment that Plaintiffs believe was sexual harassment.  [*Id.* at ¶ 52; Doc. 42 at ¶ 52].

In March 2019, several Explorers, including Ms. Mirceska, were practicing arrest techniques.  [Doc. 42-18 at 82:21–85:11].  During the exercise, Ms. Mirceska was paired with S.A., who was the searching officer.  [*Id.* at 85:6–11].  As she lay prone on the ground, S.A.'s hand touched her bare back underneath her shirt for a "couple seconds."  [*Id.* at 85:13–84:10, 89:14–16].  Ms. Mirceska states that she reported the incident to Detective Singleton that day, although he claims he was never made aware of it.  [*Id.* at 92:23–93:8; Doc. 38-2 at 135:16–21].  S.A. was not disciplined for this incident.  [Doc. 42 at ¶ 14; Doc. 45 at 3].

6

In July 2019, Ms. Rooney again raised the issues of inequitable dress code enforcement with Detective Singleton, including the leggings incident, in a written "concern form" and at an Explorer meeting.  [Doc. 42-7 at 199:3–22; Doc. 42-8 at 2–4].

***Plaintiffs' Dismissal from the Program and Ceremonial Reinstatement.***  In June 2019, Plaintiffs and two other female Explorers formed a text message group chat where they exchanged photos with mocking captions (memes) of other Explorers and Advisors, including S.A., Sergeant Smick, and the female Advisor who had disciplined Ms. Nagra, referencing some of the incidents described above.  [Doc. 38-3 at 170:9–171:3; Doc. 38-15].  The group chat migrated to a private Instagram page, where the memes were reposted.  [Doc. 42-1 at 176:1–177:21; Doc. 42-18 at 121:11–16; Doc. 42-19 at 97:25–98:2].  Plaintiffs knew they would get in trouble if the Program learned about the Instagram page and discussed ways to conceal it, including which other Explorers they could or could not trust to tell.  [Doc. 38-15 at 8–12].

Detective Singleton later obtained screenshots from both the Instagram page and the group chat.  [Doc. 38-2 at 147:8–24; Doc. 42-7 at 171:18–20].  In late July 2019, after meeting separately with each Plaintiff, Detective Singleton suspended each of them.  [Doc. 38-18].  In November 2019, Detective Singleton issued written Notices of Disciplinary Action summarizing the investigation and dismissing the Plaintiffs from the Program for violating multiple SOPs relating to personal conduct and social media use.  [*Id.*].

Each Plaintiff filed a written appeal.  [Doc. 38-19].  Although Plaintiffs acknowledged, to varying degrees, some wrongdoing, they explained that their conduct was motivated by their frustrations with the prior incidents and what they perceived as the

Program's failure to address them, leading them to create a "private" forum to vent those frustrations. [*Id.*]. On December 10, 2019, the Commander of the Aurora Police Department's Major Investigations Unit denied the appeals. [Doc. 38-20].

After the denial of Plaintiffs' appeals, Ms. Rooney's mother lodged complaints against the Program, the Aurora Police Department, and the Chief of Police, alleging a failure to investigate the complaints against S.A. and seeking Plaintiffs' reinstatement. [Doc. 38-21 at 59:2–10; Doc. 38-22; Doc. 42-9 at 19–21]. Eventually, the City of Aurora hired an independent investigator to review her complaints, with a specific focus on the handling of the 2018 incident where S.A. touched Ms. Nagra and another female Explorer. [Doc. 38-21 at 58:9–59:15; Doc. 38-22]. The independent investigator found that this incident was "appropriately addressed" at the time and subsequently, and that additional follow-up on Plaintiffs' complaints was not warranted. [Doc. 38 at 14].

In July 2022, the Aurora Police Department agreed to "ceremonially reinstate" Plaintiffs. [Doc. 38-23; Doc. 42-9 at 25–26]. The Department stated that the resolution was not "intended as an admission of liability or fault on any of the parties," but instead was "made in good faith to honor the experiences" of the Plaintiffs in the Program. [Doc. 42-9 at 25]. The resolution letter explicitly stated that Plaintiffs would be ceremonially reinstated "with the understanding" that Ms. Rooney "intends to voluntarily resign" from the Program and that Ms. Nagra and Ms. Mirceska, who were past their 21st birthdays, had "already aged out" of the Program and thus were ineligible to continue. [*Id.*]. The letter also noted that, while one of the violations of the SOPs would be removed from the Plaintiffs' Notices of Disciplinary Action, their dismissals from the Program for the other violations would remain on file. [*Id.*].

8

In December 2022, the Plaintiffs filed charges against the Aurora Police Department with the Equal Employment Opportunity Commission ("EEOC") and the Colorado Civil Rights Division ("CCRD"). [Doc. 38-24]. On October 23, 2023, they filed the instant Complaint. [Doc. 1].

Plaintiffs assert five claims against the Aurora Police Department: (1) sex discrimination in violation of Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. §§ 2000e–2000e-17, as amended ("Count I"); (2) retaliation in violation of Title VII ("Count II"); (3) sex discrimination in violation of the Colorado Anti-Discrimination Act ("CADA"), Colo. Rev. Stat. §§ 24-34-301 to -309 ("Count III"); (4) aiding and abetting a sexually hostile work environment in violation of CADA ("Count IV"); and (5) retaliation in violation of CADA ("Count V"). *See* [Doc. 1 at ¶¶ 113–51]. The Aurora Police Department moves for summary judgment in its favor on all counts. [Doc. 38].

## LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if there is sufficient evidence so that a rational trier of fact could resolve the issue either way. A fact is material if under the substantive law it is essential to the proper disposition of the claim." *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011) (citation and quotations omitted).

If the movant demonstrates that no genuine issues of material fact exist, the burden shifts to the non-movant to "set out specific facts showing a genuine issue for trial." *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010) (quoting Fed. R.

Civ. P. 56(e)(2)). The non-movant must point to competent evidence showing a genuine factual issue; it cannot rely on "[u]nsubstantiated allegations" or "mere speculation, conjecture, or surmise." *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

Because the defendant bears the burden of proof on any affirmative defense, in moving for summary judgment, "[t]he defendant . . . must demonstrate that no disputed material fact exists regarding the affirmative defense asserted." *Hutchinson v. Pfeil*, 105 F.3d 562, 564 (10th Cir. 1997). If the defendant makes this initial showing, "the plaintiff must then demonstrate with specificity the existence of a disputed material fact." *Id.* If the plaintiff cannot meet this burden, "the affirmative defense bars [the] claim, and the defendant is . . . entitled to summary judgment as a matter of law." *Id.*

In considering the evidence in the record, the Court cannot and does not weigh the evidence or determine the credibility of witnesses. *See Fogarty v. Gallegos*, 523 F.3d 1147, 1165 (10th Cir. 2008). At all times, the Court views the record in the light most favorable to the nonmoving party. *Banner Bank v. First Am. Title Ins. Co.*, 916 F.3d 1323, 1326 (10th Cir. 2019).

## ANALYSIS

Defendant moves for summary judgment on four independent grounds: (1) the Aurora Police Department is not an independent legal entity capable of being sued; (2) Plaintiffs failed to timely exhaust their administrative remedies; (3) Plaintiffs were not employees under Title VII and CADA; and (4) Plaintiffs cannot show that they suffered sex discrimination or retaliation. [Doc. 38].

For the reasons below, the Court does not grant summary judgment on ground (1), but instead construes the claims against the proper defendant, and grants summary

judgment as to the Title VII claims on grounds (2) and (3). Because the Court reaches these conclusions, it will not reach ground (4). Additionally, as the Court is dismissing all claims arising under federal law, it declines to exercise supplemental jurisdiction over Plaintiffs' state-law claims. 28 U.S.C. § 1367(c)(3); *Smith v. City of Enid ex rel. Enid City Comm'n*, 149 F.3d 1151, 1156 (10th Cir. 1998) ("When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims.").

## I.    The Court Construes the Claims as Against the City of Aurora

As an initial matter, Defendant is correct that the Aurora Police Department is not a proper defendant. The Tenth Circuit is clear that police departments are not "separate suable entit[ies]" from the municipalities they serve. *Martinez v. Winner*, 771 F.2d 424, 444 (10th Cir. 1985), *modified in part on other grounds*, 778 F.2d 553 (10th Cir. 1985), *vacated on other grounds*, 475 U.S. 1138 (1986); *accord Benton v. Town of South Fork*, 587 F. App'x 447, 449 (10th Cir. 2014). There is no evidence that the City of Aurora "has taken explicit steps" to grant the Aurora Police Department with "jural authority" to "engage in any litigation except in concert with the government itself." *Brown v. City of Tulsa*, 124 F.4th 1251, 1264 (10th Cir. 2025) (quotation omitted). To the contrary, the Aurora City Charter reflects that the City maintains oversight and control over the Police Department. [Doc. 45-1]. Therefore, the Aurora Police Department is not a suable entity.

Rather than dismissing the Complaint on this basis, however, the Court construes Plaintiffs' claims as asserted against the City of Aurora as the real party in interest. *See, e.g.*, *Mahan v. Huber*, No. 09-cv-00098-PAB-BNB, 2010 WL 749810, at *1, *4 (D. Colo. Mar. 2, 2010) (construing claims against police department as being pleaded against the

municipality); *Lopez v. Bd. of Cnty. Comm'rs for Lea Cnty.*, No. 15-cv-00822 WPJ-LAM, 2016 WL 10588126, at *4 (D.N.M. Mar. 4, 2016) (same); *Austin v. Redford Twp. Police Dep't*, 859 F. Supp. 2d 883, 903 n.6 (E.D. Mich. 2011) (same). The City of Aurora received notice of this litigation—its Human Resources Director was deposed—and, importantly, suffers no prejudice from substitution. *See Sweat v. Las Cruces City Police Dep't*, No. 04-cv-01329-KBM-LCS, 2005 WL 8163661, at *2 (D.N.M. Sept. 26, 2005) (citing *Kentucky v. Graham*, 473 U.S. 159, 166-67 (1985)). Indeed, the Aurora Police Department filed an Answer to the Complaint in which it did not raise any defense (or even suggestion) that it would take the position that dismissal was appropriate because the incorrect party was named. [Doc. 25].

The Court therefore directs the Clerk to substitute "The City of Aurora" for the "Aurora Police Department" as Defendant in this action. *See Sweat*, 2005 WL 8163661, at *2; *see also Doe v. Del. State Police*, 939 F. Supp. 2d 313, 324 n.3 (S.D.N.Y. 2013) ("[T]here is ample authority for the proposition that a municipality can be substituted as a defendant for its agencies.").

## II.    Plaintiffs' Claims Are Time-Barred

Having construed the claims against the City of Aurora, the Court turns to Defendant's exhaustion defense. Plaintiffs' Title VII claims must be dismissed because they failed to timely exhaust their administrative remedies following their 2019 dismissal from the Program.

Title VII requires a plaintiff to exhaust administrative remedies before filing suit. Specifically, a plaintiff must first file a charge with the EEOC within 300 days of the "alleged unlawful employment practice." 42 U.S.C. § 2000e-5(e)(1). Although failure to

exhaust is not jurisdictional, it is a mandatory claims-processing rule that must be enforced when properly raised as an affirmative defense. *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1185–86 (10th Cir. 2018); *Hueston Green v. Garland*, 716 F. Supp. 3d 1125, 1134 (D.N.M. 2024) (citing *Fort Bend Cnty. v. Davis*, 587 U.S. 541, 548–49 (2019)). Defendant raised this affirmative defense in its Answer, [Doc. 25], and has made an unrebutted showing that there is no disputed material fact as to exhaustion.

Plaintiffs were dismissed from the Program on November 7, 2019, and their appeals were denied on December 10, 2019. [Doc. 38-18; Doc. 38-20]. Assuming without deciding that the latter date constituted a separately actionable "adverse employment decision," the latest Plaintiffs could have filed charges with the EEOC to comply with the 300-day deadline was October 5, 2020. *But see Elec. Workers v. Robbins & Meyers, Inc.*, 429 U.S. 229, 234 (1976) (holding that the date of plaintiff's discharge, not the conclusion of a grievance arbitration procedure, controlled for purposes of determining when claim accrual period started). However, Plaintiffs only filed charges with the agency in December 2022, more than two years past the statutory time limit. [Doc. 38-24]. Therefore, the Title VII claims must be dismissed with prejudice for failure to timely exhaust administrative remedies. *See Zapata v. Colo. Christian Univ.*, No. 18-cv-02529-CMA-NYW, 2019 WL 1544179, at *7 (D. Colo. Mar. 15 2019) (dismissing unexhausted claim with prejudice where the time to file administrative charge had "long lapsed").

Plaintiffs attempt to resist this straightforward conclusion by asserting that the last discriminatory act was their "ceremonial reinstatement" by letter dated July 12, 2022, which they frame as a "constructive discharge," thereby bringing their administrative

13

charges within the statutory window. [Doc. 42 at 14]. Alternatively, they claim that the charges were timely because their 2019 dismissal was the initial triggering event in a "continuing violation" that culminated in the denial of their formal reinstatement in 2022. [*Id.* at 14–15]. Neither theory applies.

Under Title VII, a "constructive discharge" occurs when an employee is not fired but instead resigns "in the face of intolerable discrimination." *Green v. Brennan*, 578 U.S. 547, 550 (2016). To establish a constructive discharge, a plaintiff must show that, because of unlawful discrimination, their "working conditions" were "so intolerable that a reasonable person in the employee's position would have felt compelled to resign." *Id.* at 555. For instance, in *Green*, the plaintiff was given the choice to retire or accept a significant demotion and substantial pay cut in a different state. *Id.* at 551. In cases of constructive discharge, the time period for administrative exhaustion starts from the date the employee resigns. *Id.* at 563–64.

This doctrine is wholly inapposite here. Plaintiffs' "ceremonial reinstatement" cannot be recast as a "constructive discharge" in order to extend the statutory time limit. Even assuming, as Plaintiffs contend, that the ceremonial reinstatement conferred no meaningful benefit—they could not rejoin the Program, their dismissals remained on record, and they were ineligible for civil service preference points—they have not adduced sufficient evidence to allow a factfinder to conclude that they were forced to resign because of the Program's "intolerable working conditions." *Pa. State Police v. Suders*, 542 U.S. 129, 141 (2016). Plaintiffs had not been participants in the Program for over two and a half years at the time of their ceremonial reinstatement. Furthermore, two of the three Plaintiffs, Ms. Nagra and Ms. Mirceska, were concededly ineligible to participate

14

in the Program due to their age.  And the third, Ms. Rooney, was ceremonially reinstated on the express condition that she immediately resign.  In other words, the Program had no intention of allowing Ms. Rooney to be a full-fledged Explorer again—and their "resolution" of the post-dismissal complaints lodged by Ms. Rooney's mother reflects that. [Doc. 42-9 at 22].  One cannot be constructively discharged from a position they do not hold.[6]

The "continuing violation" doctrine is also of no help to Plaintiffs.  This doctrine applies "when the plaintiff's claim seeks redress for injuries resulting from a series of separate acts that collectively constitute one unlawful act, as opposed to conduct that is a discrete unlawful act"; or, put differently, "one violation continues when the conduct as a whole can be considered a single course of conduct."  *Hamer v. City of Trinidad*, 924 F.3d 1093, 1098 (10th Cir. 2019) (quotation omitted).  Importantly, however, the continuing violation doctrine is "triggered by continual unlawful acts, not by continual ill effects from the original violation."  *Id.* at 1099 (quotation omitted).

Plaintiffs' dismissal from the Explorer Program constitutes a discrete act.  *See National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002) ("Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify"

---

[6] Nor do Plaintiffs argue or present any evidence that Defendant prevented Plaintiffs from timely filing charges with the EEOC that might equitably toll the time period for exhaustion. *See Bennet v. Quark, Inc.*, 258 F.3d 1220, 1226 (10th Cir. 2001).  The formal appeals process, which resulted in the uniform denial of Plaintiffs' claims, concluded barely one month after their dismissal.  [Doc. 38-20].  Subsequent efforts by Ms. Rooney's mother to persuade the Program, the Aurora Police Department, or the City of Aurora to revisit that decision as well as to reinvestigate the 2018 incident involving S.A. followed.  [Doc. 38-22; Doc. 42-9; Doc. 42-21].  But the continued engagement by various officials with these complaints, without more, do not create a genuine dispute of material fact that Defendant "dragg[ed] out" the appeals process or otherwise caused Plaintiffs to miss the statutory deadline.  [Doc. 42 at 14].

and must be administratively exhausted within 300 days or forfeited.).  The fact that Plaintiffs "repeatedly challenged their removal" and "engaged in reinstatement negotiations" with the Aurora Police Department is of no moment.  [Doc. 42 at 14].  And while Plaintiffs allege that they were "subjected to ongoing discriminatory barriers to reentry" between 2019 and 2022, they do not adduce any evidence of any actions by Defendant during that time period to support this argument.  [*Id.*].

At most, Plaintiffs continued to experience the "ill effects" of their dismissal through the 2022 ceremonial reinstatement—which made clear that they would not be restored to their prior standing in the Program.  *Hamer*, 924 F.3d at 1098.  But this is exactly what the Supreme Court and the Tenth Circuit have said does not constitute a continuing violation allowing a plaintiff to reach back to litigate discrete unlawful acts that fall outside of the 300-day claims accrual period.  *See Del. State Coll. v. Ricks*, 449 U.S. 250, 257–59 (1980) (holding that professor who was denied tenure failed to timely exhaust his administrative remedies by filing charges only after the expiration of his subsequent one-year "terminal" teaching contract); *Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1185 (10th Cir. 2003) (rejecting invocation of the continuing violation doctrine where plaintiff sought to link a time-barred failure-to-hire claim to a separate, timely one).

Therefore, Plaintiffs' claims are untimely and summary judgment in favor of Defendant is appropriate.

## III.    Plaintiffs Were Not Employees Under Title VII

Even if Plaintiffs' Title VII claims were not time-barred, summary judgment is independently required because there is no genuine dispute of material fact as to whether Plaintiffs were employees under that statute.  They were not.

Title VII has an "unhelpful and circular definition" of "employee," defining the term as "an individual employed by an employer." *Johnston v. Espinoza-Gonzalez*, No. 16-cv-00308-CMA-KLM, 2016 WL 7188524, at *3 (D. Colo. Dec. 12, 2016); *see* 42 U.S.C. § 2000e(f).    The Supreme Court has instructed that, absent a more specific statutory definition, "employee" refers to "the conventional master-servant relationship as understood by the common-law agency doctrine." *Johnston*, 2016 WL 7188524, at *3 (quoting *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322–23 (1992)).   In line with this guidance, the Tenth Circuit determines whether a plaintiff is an employee for purposes of Title VII by examining "the totality of circumstances surrounding the working relationship between the parties," with a particular focus on "whether and to what extent a putative employer has the right to control the means and manner of the worker's performance."   *Zinn v. McKune*, 143 F.3d 1353, 1357 (10th Cir. 1998) (quotations omitted).

But where, as here, the putative employee is unpaid, the Tenth Circuit applies a threshold-remuneration test. *Johnston*, 2016 WL 7188524, at *4.  Under this test, courts analyze whether the plaintiffs received remuneration before proceeding to the common-law agency analysis. *Id.*  "In general, to satisfy the test, the plaintiff must receive direct remuneration or indirect benefits that are substantial or significant and not incidentally related to advancing the purpose of the putative employer." *Sacchi v. IHC Health Servs., Inc.*, 918 F.3d 1155, 1158 (10th Cir. 2019); *see also McGuiness v. Univ. of N.M. Sch. of Med.*, 170 F.3d 974, 979 (10th Cir. 1998) (holding that unpaid medical student was not an employee of medical school).

17

In *Sacchi*, the Tenth Circuit held that an unpaid intern training to be a certified child-life specialist at a children's hospital was not an employee that could sue under Title VII and other antidiscrimination statutes after she was terminated from her position. 918 F.3d at 1156–57. The *Saachi* court concluded that "practical experience, exposure to a career field, networking, and the esteem of potential employers" were "too attenuated and conditional" to constitute "substantial or significant indirect benefit[s]" as required under the threshold remuneration inquiry. *Id.* at 1159 & n.4. It further explained that recognizing virtually all unpaid interns as protected employees, even if desirable from a policy perspective, would substantially expand Title VII beyond Congress's design. *Id.*

By contrast, courts have recognized that "an employment relationship within the scope of Title VII can exist even when the putative employee receives no salary so long as he or she gets numerous job-related benefits." *Johnston*, 2016 WL 7188524, at *4 (quotation omitted). For example, whether a volunteer firefighter was an employee constituted a jury question where the plaintiff received extensive financial and other benefits, including disability and survivors pensions, life insurance, tuition reimbursement, workers' compensation coverage, tax exemptions, and certification opportunities. *Haavistola v. Cmty. Fire Co. of Rising Sun, Inc.*, 6 F.3d 211, 221 (4th Cir. 1993); *see also Pietras v. Bd. of Fire Comm'rs of Farmingville Fire Dist.*, 180 F.3d 468, 473 (2d Cir. 1999) (affirming trial court's finding that probationary firefighter was a Title VII employee where she "received benefits under state law that were considerably more generous than the benefits received by the plaintiff in *Haavistola*," including a retirement pension). On the other hand, benefits that are "purely incidental" to a volunteer's service—i.e., de minimis compensation, a uniform, badge, and equipment, and job training—do not create a factual

18

question as to employee status. *Juino v. Livingston Parish Fire Dist. No. 5*, 717 F.3d 431, 439–440 (5th Cir. 2013).

In this case, Plaintiffs simply ignore the threshold remuneration requirement. [Doc. 42 at 15–17 (applying the *Darden* factors)]. However, this preliminary analysis is mandatory, and properly applied, it is clear that the asserted benefits they received were not sufficiently substantial or significant to establish an employment relationship. *Sacchi*, 918 F.3d at 1158. At the outset, unlike the volunteer firefighters in *Haavistola* and *Pietras*, Plaintiffs received no pension or insurance benefits for themselves or their families. They were not eligible for workers' compensation, tax exemptions, reimbursements for educational or certification courses or travel expenses. In short, they received nothing of financial value. *See York v. Ass'n of Bar of City of N.Y.*, 286 F.3d 122, 126 (2d Cir. 2002). The benefits Plaintiffs do identify—the provision of a uniform and equipment, law enforcement training, access to meeting space, and mental health counseling—are merely incidental to their volunteer service with the Aurora Police Department. *See Juino*, 717 F.3d at 440.

Plaintiffs also point to the civil service preference points available to former Explorers who later applied to the Aurora Police Department. While this hiring preference is more concrete than the networking or future employment opportunities offered by many internship or volunteer programs, it is still "too attenuated and conditional to constitute substantial indirect benefits." *Sacchi*, 918 F.3d at 1159. Importantly, the preference did not guarantee full-time employment. Rather, this potential benefit could "only be realized if subsequent events occurred independently of the [volunteer] relationship," and does not create a genuine factual dispute as to Plaintiffs' status under Title VII. *Id.*

Finally, Plaintiffs emphasize that the Program was "a structured, paramilitary-style training initiative" with a chain-of-command, opportunities for advancement, SOPs, formal supervision and evaluation, and disciplinary procedures.  [Doc. 42 at 15–16].  But these features go to control and organization—not remuneration—and are therefore irrelevant where, as here, Plaintiffs fail to satisfy the threshold requirement.  *See Juino*, 717 F.3d at 439 (rejecting Title VII claim under this test despite allegations that the volunteer firefighter program "had a paramilitary organizational structure with the authority to supervise, hire, fire, and set applicable rules and regulations of work").

Accordingly, as a matter of law, Plaintiffs were not employees protected by Title VII, and summary judgment on these claims is also warranted on this basis.  And as discussed above, in the absence of federal jurisdiction, this Court respectfully declines to exercise jurisdiction with respect to Plaintiffs' claim arising under CADA.  *See Smith,* 149 F.3d at 1156.  Therefore, insofar as Defendant seeks summary judgment with respect to Counts IV and V, the Motion is respectfully **DENIED as moot**.

### CONCLUSION

For the reasons stated herein, **IT IS ORDERED** that:

(1)    The Clerk of the Court is **DIRECTED** to **SUBSTITUTE** the City of Aurora for the Aurora Police Department as the Defendant in this case;

(2)    Defendant's Motion for Summary Judgment [Doc. 38] is **GRANTED in part** as to Plaintiffs' claims arising under Title VII of the Civil Rights Act of 1964. Summary judgment is **ENTERED** in favor of Defendant City of Aurora and **AGAINST** Plaintiffs Kaitlyn Rooney, Rupjot Nagra, And Teona Mirceska as to Counts I, Count II, and Count III;

(3)    The Court declines to exercise supplemental jurisdiction over Plaintiff's claims arising under the Colorado Anti-Discrimination Act.  Accordingly, Counts III, IV, and V are **DISMISSED without prejudice**, and Defendant's Motion for Summary Judgment is **DENIED as moot** as to these claims;

(4)    Defendants are entitled to their costs under Federal Rule 54 and Local Rule 54.1; and

(5)    The Clerk of Court is **DIRECTED** to **TERMINATE** this case.

DATED:  March 26, 2026          BY THE COURT:

_____
Nina Y. Wang
United States District Judge

21